**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CLEO FIDDEMON,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:21-144** |
| **v.** | : | **(JUDGE MANNION)** |
| **PATROLMAN ROBERT MAHOLIK,** | : | |
| **PATROLMAN JOSEPH WOZNIAK,** | | |
| **and WILKES-BARRE TOWNSHIP,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

Presently before the court is the defendants' motion for summary judgment. (Doc. 23). Defendants filed a brief in support, (Doc. 25); Plaintiff Cleo Fiddemon filed a brief in opposition, (Doc. 30), and Defendants replied, (Doc. 31). Fiddemon brings this civil rights action pursuant to 42 U.S.C. §1983 alleging numerous constitutional violations arising out of his arrest in Wilkes-Barre Township on December 13, 2019. Defendants filed their motion for summary judgment after their motion to dismiss Fiddemon's amended complaint but before the court's decision thereon. On April 31, 2022, the court issued an order on Defendants' motion to dismiss, granting the motion in part and dismissing the following claims with prejudice: Fiddemon's claims in Count I against the defendants in their official capacities; Fiddemon's

claims in Count II; Fiddemon's claims for injunctive relief and declaratory judgment; and Fiddemon's claims for punitive damages against Wilkes-Bare and the defendant officers in their official capacities. (Doc. 33). Accordingly, the court will only address Defendants' summary judgment motion with respect to Fiddemon's remaining claims in Count I: (1) Excessive force against the officer defendants; (2) False arrest against the officer defendants; (3) punitive damages against the officer defendants; and (4) municipal liability claims against Wilkes-Barre.

Defendants' motion raises the principal issue of the constitutionality of police officers forcibly dragging an allegedly noncompliant individual from the processing room of a police station to a holding cell pending arraignment. Due to the significant disputed facts in the record regarding Fiddemon's alleged noncompliance with the officers' commands to get up and walk to the holding cell, and the precise nature of Officer Maholik's pain compliance technique effected on Fiddemon to gain compliance, the question of excessive force should go to a trier of fact. However, Fiddemon has failed to raise a genuine dispute of material fact as to his remaining claims against the officers and Wilkes-Barre. Thus, the court will **GRANT in part** and **DENY in part** Defendants' motion for summary judgment.

- 2 -

I. <u>**FACTUAL BACKGROUND**</u>[1]

With respect to Defendants' motion for summary judgment, the essential, undisputed facts are as follows.

**A. The Initial Stop and Detention**

On December 13, 2019, Fiddemon went to a Wal-Mart in Wilkes-Barre Township, Pennsylvania, to purchase a bag of chips. (Doc. 30-1). Fiddemon was on his journey home to Georgia from Buffalo, New York, where he had recently delivered a load of freight a couple days prior. Fiddemon, a self-employed truck driver, says he was "off-duty," meaning he had been relieved from work by the motor carrier who hired him. According to Fiddemon, this meant he no longer needed to don a magnetic Department of Transportation (DOT) number on his truck, which he says he removed from his truck before he left Buffalo. Defendant Officer Robert Maholik, a police officer employed by the Wilkes-Barre Police Department, saw Fiddemon driving his commercial motor vehicle without the appropriate stickers prior to entering the Wal-Mart parking lot. Officer Maholik ran Fiddemon's tag and discovered Fiddemon had been stopped in Arkansas years prior for a commercial vehicle inspection. Officer Maholik drove into the Wal-Mart parking lot,

---

[1] The factual background is taken from the parties' submissions to the extent they are consistent with the evidence in the record. (Docs. 23, 24, 25, 30, 31).

approached Fiddemon on foot—Fiddemon having exited his vehicle by this point—and requested Fiddemon produce identification. Fiddemon refused to produce any license, registration, or vehicle information documents. Officer Maholik explained that this was a traffic stop, to which Fiddemon protested, "It's not a traffic stop. I'm not in my truck," and still refused to turn over any identification.

Fiddemon returned to his truck approximately 60 feet away to retrieve his cell phone and started recording video. Then Officer Maholik informed Fiddemon that the nature of the stop was to conduct a DOT inspection. Fiddemon continued to refuse to produce his identification when requested because, "I did not commit a crime; I wasn't about to commit a crime; and I hadn't committed a crime." Fiddemon informed Officer Maholik that he was off duty and had removed the magnetic DOT identifiers from his vehicle prior to going off duty. Fiddemon shed more light on his reason for noncompliance and tape recording in his deposition, explaining that "it's not normal for an officer to approach anyone on foot and just ask them for their ID . . . he can't approach me because he's curious about something . . . his authority does not start because he has on a uniform. His authority starts when there is a crime being committed. There was no crime[,]" since, according to

Fiddemon, not having a DOT identifier displayed on his truck was not a DOT violation because he was not "engaged in commerce." (Doc 30-3).

Since Fiddemon would not cooperate in the inspection, Officer Maholik had to contact a local towing company to dispatch someone to operate the controls of Fiddemon's vehicle. Officer Maholik also had to request another officer come to the scene due to Fiddemon's lack of cooperation. Defendant Officer Joseph Wozniak and Officer Isaac Troutman arrived on the scene shortly thereafter. Officer Maholik had Fiddemon sit on his trailer while he called Southwestern Trucking, the company Fiddemon was contracted with, which confirmed Fiddemon was returning from a trip to New England. Despite further requests, Fiddemon refused to produce his identification, logbook, or bills of lading. Officer Maholik proceeded to conduct a commercial vehicle inspection, during which Fiddemon was placed in handcuffs in the back of a patrol car. Fiddemon testified he was in the back of the patrol car for approximately one to two hours while Officer Maholik conducted his investigation. Near the end of the investigation, Fiddemon indicated that he had a previous shoulder injury and that he was experiencing discomfort because the handcuffs were too tight and were aggravating the preexisting injury. Officer Maholik summoned EMS to evaluate Fiddemon at the station.

## B. The Transportation to the Police Station

Following the inspection, the officers took Fiddemon to the police station. Officer Maholik arrested Fiddemon because of his vehicle code infractions, failure to identify himself, and failure to cooperate with the inspection. Officer Maholik explained, "[Fiddemon] was detained and brought forthwith to our police department so that I could take him before a duty magistrate. The Commonwealth allows for us, as police officers, to bring forthwith to a duty magistrate any person who is either from out of state or who we believe would not comply with any penalties that may or may not have been assessed." (Doc. 24-2 at 19).[2] Fiddemon was to go before a judge because he was from out of state and would be arraigned on the citations. At the station, Fiddemon was handcuffed to a pole in a processing room. Officer Maholik, Officer Wozniak, and Officer Jonathan Kaskey were all on scene. Officer Maholik spoke with the on-duty magistrate who indicated that several other people needed to be seen before Fiddemon, and that it would be over an hour before Fiddemon was seen. As a result, Officer Maholik requested that Fiddemon move to a holding cell until he was able to be seen by the magistrate. Officer Wozniak explained that the reason they needed to

---

[2] *See* 75 Pa.C.S. §6305(a) ("Upon arrest of a nonresident for any violation of this title, a police officer shall escort the defendant to the appropriate issuing authority for a hearing . . . .").

transfer Fiddemon to the holding cell pending arraignment was it allowed only one officer to watch Fiddemon while he was in the holding cell, thereby freeing up the other officers to attend to other service matters. (Doc. 24-3).

### C. The Forcible Transfer to the Holding Cell

Before transferring Fiddemon to the holding cell, paramedics had arrived at the station to check Fiddemon's wrists and hands since he had complained earlier about the tightness of his handcuffs. While they were doing so, Fiddemon told one of the paramedics, "I shouldn't even be here." He also expressed, "They're trying to intimidate me." At this point in the narrative, the parties' allegations diverge significantly. As stated previously, following the EMS evaluation, the officers made the decision to place Fiddemon in a holding cell due to the back log of hearings before the magistrate.

According to the officers, Officer Wozniak and Officer Maholik asked Fiddemon to walk to the holding cell. Fiddemon questioned why he had to go into the holding cell, and Officer Wozniak explained to him that he was going to stay in the holding cell until his arraignment. Officer Wozniak verbally commanded Fiddemon multiple times to stand up and walk to the holding cell. Fiddemon refused. "[Fiddemon] basically sat in the chair [in the processing room], crossed his hands and his arms and his feet and shrugged

his shoulders[.]" (Doc. 30-5). Officer Kaskey described Fiddemon's conduct as passive resistance. (*See* Doc. 30-12, Kaskey Deposition) ("[Fiddemon] had virtually gone limp. He didn't move, and when the cuff was removed, he just went limp. He became motionless . . . I would say it is passive resistant. He wasn't active resistant. He wasn't combative. He wasn't hurling punches, kicking, nothing like that. It was passive resistance I would describe it as.")

Officer Wozniak told Fiddemon if he did not cooperate he would be physically placed into the holding cell. Fiddemon refused to go to the holding cell and told the officers he was not afraid of them. Officer Wozniak responded, "We're not scared of you either." At that point, Officer Wozniak uncuffed Fiddemon from the pole and dragged him off his chair. Rather than stand up, Fiddemon elected to go limp, passively resisting the officers' commands. Then Officer Maholik stepped in to try to secure compliance from Fiddemon: "I, [Officer Maholik], had Mr. Fiddemon underneath the nose, at the nerve bundle of his septum to attempt to get him to comply[.]" (Doc. 30-2 at 31). Officer Maholik explained further, "It is simply a matter of taking a portion of my index finger, placing it under Mr. Fiddemon's nose in the septum area and applying slight pressure to the back of his head to cause a painful stimul[us] in order to get compliance." (Doc. 30-2 at 32). The officers tried to pick Fiddemon up off the floor, but Fiddemon simply laid there.

According to Fiddemon, he was sitting in the processing room complaining to the paramedics about how he should not have been arrested in the first place and that the officers were trying to intimidate him, after which Officer Wozniak immediately got in his face, said, "We're not scared of you either," uncuffed him from the pole, and yanked him out of his chair. Then Officer Maholik suddenly ran into the room and put Fiddemon in a chokehold, torquing Fiddemon's neck in the opposite direction of the way Officer Wozniak was pulling Fiddemon, which sent excruciating pain down Fiddemon's back.

At this point, the parties' divergent narratives meet again. After Officer Maholik's septum pain compliance maneuver (or chokehold and neck torque according to Fiddemon's testimony), Officer Wozniak, Officer Maholik, and Officer Kaskey dragged Fiddemon to the holding cell which is approximately 20 to 50 feet away from the processing room. Officer Wozniak dragged Fiddemon by his wrists; Officer Maholik says they dragged Fiddemon by his arms. Fiddemon was then handcuffed to an anchor in the holding cell where he "basically laid on his back and closed his eyes and just laid there the entire time." (Doc. 30-5). Fiddemon did not complain of pain or discomfort while he was being dragged or once he was in the holding cell.

Fiddemon was eventually seen by the local magistrate. After a hearing, the magistrate dismissed all his charges relating to the traffic violations and resisting arrest.

### D. Officer Training

In light of Fiddemon's municipal liability claims against Wilkes-Barre Township, a little background on officer training is necessary. The record demonstrates that, prior to the incident herein, Wilkes-Barre provided and/or required some degree of training in use of force for its police officers. There is apparent dispute as to the exact extent and frequency of training specific to use of force. Chief of Police William Clark testified that Wilkes-Barre provided mandatory training for all newly on-boarded officers, which included use of force training. (Doc. 24-7). Chief Clark also explained that Wilkes-Bare employs a use of force reporting system which requires any use of force to be documented in the police incident report and in a supplemental report provided to the detective lieutenant—an example of which was completed by Officer Maholik in this case, (*see* Doc. 30-10). Lieutenant Charles Dyanick also testified that all members of the Wilkes-Barre Township Police Department are required to attend use of force training; and use of force training, along with other subjects, occurs on an annual basis through the Municipal Police Officers Education and Training Commission. (Doc. 24-6).

Officer Kaskey testified he has received use of force and taser training as a member of the Wilkes-Bare Police Department, as well as de-escalation technique training. (Doc. 24-5). Officer Kaskey described yearly trainings regarding use of force as "a refresher of our policy, the refreshing on the handling of equipment," and "[a]s it relates to arrest and control techniques . . . I believe it may have been touched upon briefly in [a 2012 training]." (Doc. 30-1 at 12).

Officer Maholik testified he received use of force training almost annually, but he could not initially explain what the training entailed. (Doc. 24-2). After further questioning, Officer Maholik explained, "Generally, use of force training is a review, goes over the use of force continuum and just a review or reminder of, you know, an officer's ability to use force in a situation to gain compliance of an individual and neutralize a threat." Officer Wozniak testified he received use of force training in the academy but went onto describe his training as involving "just your basic grappling type maneuvers. Years later, I received training from the Pennsylvania State Police with vehicle removal techniques and that's the gist of it." (Doc. 30-1). And Officer Troutman testified he had not received training on use of force while employed by Wilkes-Barre Township Police Department from August 2018 to mid-2020. (Doc. 30-4).

- 11 -

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Aetna Cas. & Sur. Co. v. Ericksen*, 903 F.Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). The court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323–24. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003); *see also Celotex*, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The non-moving party must direct the court's attention to specific, triable facts by "*citing particular parts* of materials in the record." Fed. R. Civ. P. 56(c)(1)(A) (emphasis added); *see United States v. Starnes*, 583 F.3d 196, 216 (3d Cir. 2009) ("Judges are not like pigs, hunting for truffles buried in briefs.") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991)); *see also DeShields v. Int'l Resort Properties Ltd.*, 463 F. App'x 117, 120 (3d Cir. 2012) ("If factual support for [a plaintiff's] claim exist[s] in the record, it [i]s incumbent upon her to direct the District Court's attention to those facts.").

If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23; *Jakimas v. Hoffman–La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007).

## III.   DISCUSSION

Fiddemon's civil rights claims against Officer Maholik, Officer Wozniak, and Wilkes-Barre Township are addressed in turn.

### A. Officers Maholik and Wozniak

"Police officers, embodying the authority of the state, are liable under [42 U.S.C.] §1983 when they violate someone's constitutional rights, unless they are protected by qualified immunity." *El v. City of Pittsburgh*, 975 F.3d 327, 334 (3d Cir. 2020) (quoting *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007)). "In the familiar qualified immunity analysis, the court asks "(1) whether the officer violated a constitutional right, and (2) whether the right was clearly established, such that 'it would [have been] clear to a reasonable officer that his conduct was unlawful.'" *Id.* (quoting *Lamont v. New Jersey*, 637 F.3d 177, 182 (3d Cir. 2011)).

### 1. Excessive Force

A cause of action exists under §1983 when a law enforcement officer uses force so excessive that it violates the Fourth Amendment to the United States Constitution. *Williams v. City of York, Pennsylvania*, 967 F.3d 252, 259 (3d Cir. 2020) (citing *Brown v. Borough of Chambersburg*, 903 F.2d 274, 277 (3d Cir. 1990)). "To maintain an excessive force claim, 'a plaintiff must show that a seizure occurred and that it was unreasonable.'" *Id.* (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 515 (3d Cir. 2003)). The parties here do not dispute Fiddemon was seized when the officers used force to drag him to the holding cell; the question is whether it was reasonable.

"The test of reasonableness under the Fourth Amendment is whether under the totality of the circumstances, the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations." *Id.* (quoting *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004)). "Because '[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,' however, its proper application requires careful attention to the facts and circumstances of each particular case." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *Bell v. Wolfish*, 441 U.S. 520,

559 (1979)) (internal citation omitted). Courts consider factors "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight," *Graham*, 490 U.S. at 396, as well as "the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time," *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997). When conducting the objective reasonableness analysis, courts should remember that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers" is constitutionally unreasonable. *Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 195 (3d Cir. 2021) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)).

As the reader can probably glean from the court's delineation of the law applicable to excessive force claims, such claims typically demand significant factual analysis at the summary judgment stage to determine whether there are genuine disputes of material fact to send to a jury. This case, however, presents an exception to that general rule due to a few facts alleged by Fiddemon that, if believed, could clearly lead a reasonable jury to

conclude that Officer Maholik and Officer Wozniak used unreasonable force against him under the circumstances.

To start, the undisputed facts leading up to the officers' use of force present a largely benign scene at the police station calling for minimal force, if any. Fiddemon was in custody for minor traffic violations and resisting arrest; the resisting arrest charge rested on insubordinate conduct by Fiddemon that, though not negligible, was largely passive—Fiddemon having flouted multiple verbal orders to produce identification and other commercial documentation. Fiddemon did not actively resist the officers nor try to flee; nor was he suspected of being armed.[3] Fiddemon was outnumbered three officers to one, and the situation at the police station unfolded over several minutes, not a few tense and dangerous seconds. In sum, there were few aggravating factors calling for any significant physical force. Then came the critical moment in the reasonableness analysis. Desiring to place Fiddemon in a holding cell pending review of the charges

---

[3] While Officer Wozniak and Officer Kaskey described the alleged resistance by Fiddemon at the police station as entirely passive, Officer Maholik's testimony alleges Fiddemon's resistance was ostensibly active in the sense that, before the officers dragged Fiddemon to the holding cell, he "became stiff" and clenched his fists. (*See* Doc. 24-2). However, as noted below, not only is there a genuine dispute as to whether Fiddemon's resistance at the police station was active or passive, there is a genuine dispute based on Fiddemon's testimony whether he resisted any commands at the police station at all.

by the local magistrate, Officer Maholik and Officer Wozniak entered the processing room where Fiddemon was seated on a chair, handcuffed to a pole, and being attended to by the paramedics. As explained above, it is at this point that the parties' competing narratives diverge significantly.

According to the officers, Officer Wozniak and Officer Maholik asked Fiddemon to walk to the holding cell. Fiddemon refused and questioned why he had to go into the holding cell; Officer Wozniak explained he must stay in the holding cell pending his arraignment. Officer Wozniak then verbally commanded Fiddemon multiple times to stand up and walk to the holding cell or else he would have to be physically placed into the cell. Fiddemon crossed his hands and arms, shrugged his shoulders, and continued to refuse to go to the holding cell, telling the officers he was not scared of them. Officer Wozniak replied, "We're not scared of you either," uncuffed Fiddemon from the pole, and dragged him off the chair. Fiddemon went limp rather than standing up, and Officer Maholik effected the pain compliance maneuver to Fiddemon's septum. Fiddemon would still not comply with the officers' orders to get up and walk to the holding cell; so, Officer Wozniak and Officer Maholik dragged Fiddemon to the holding cell by his arms and wrists.

According to Fiddemon, he was sitting in the processing room complaining to the paramedics about how he should not have been arrested

in the first place and that the officers were trying to intimidate him, after which Officer Wozniak immediately got in his face, said, "We're not scared of you either," uncuffed him from the pole, and yanked him out of his chair. Then Officer Maholik ran into the room and put Fiddemon in a chokehold, torquing Fiddemon's neck in the opposite direction of the way Officer Wozniak was pulling Fiddemon, which sent excruciating pain down Fiddemon's back. Then the officers dragged Fiddemon all the way to the holding cell approximately 50 feet across the police station.[4]

Glaringly absent from Fiddemon's version of events is any request from the officers that Fiddemon get up and walk to the holding cell, or any discussion regarding the needed transfer to the holding cell whatsoever.

---

[4] Fiddemon claims in his brief in opposition to summary judgment that the evidence demonstrates he was dragged *by his neck* all the way to the holding cell. (*See* Doc. 30 at 3). However, the record evidence is inconclusive to support this claim. Fiddemon cites his deposition to support this proposition: "Next thing I know, I'm being dragged however many feet to another cell and handcuffed to a pole." (Doc. 30-3 at 30). Nowhere does Fiddemon specifically testify that he was dragged by his neck. Fiddemon's citation to Officer Wozniak's deposition testimony on this issue is similarly unavailing: "Since we couldn't get [Fiddemon] off the floor, he wouldn't stand up—again, he acted like he played dead—he was dr[agged] from the processing room all the way over to the holding cell." (Doc. 30-5). Officer Wozniak did not specifically testify that Fiddemon was dragged by his neck. For the reasons stated in this memorandum, however, Fiddemon still survives summary judgment of his excessive force claim based on his testimony that he was not asked to go to the holding cell, he offered no resistance at the police station, and he was still placed in a chokehold and dragged to the holding cell.

(*See* Doc. 24-1 at 53–54, Fiddemon Deposition) (Q: [] And did they ask you, as some point, to get up and go to a different holding cell? A. No. Q: So[,] at no point was there a discussion about you leaving the processing room and going to a holding cell? A. No.). Rather, in the picture of the scene painted by Fiddemon, without warning and without a request or verbal order to walk to the holding cell on his own power, Officer Wozniak yanked Fiddemon off his chair, Officer Maholik put Fiddemon in a chokehold and torqued his neck, and both officers forcibly dragged him to the holding cell. Plainly, these allegations, if believed, could lead a reasonably jury to conclude that both Officer Wozniak and Officer Maholik used excessive force, and thus they present issues of material fact that must be resolved by a jury.

Defendants argue Officer Maholik and Officer Wozniak used the minimum amount of force necessary under the circumstances by dragging the noncompliant Fiddemon to the holding cell. However, this argument, at best, requires the court credit the officers' version of events—something it cannot do at the summary judgment stage. Moreover, in cases where courts have found an officer's dragging of an individual to be objectively reasonable, the officer's use of force in that manner was proceeded by multiple verbal commands or warnings and the individual's active or passive resistance thereto. For example, in *Douris*, the plaintiff was commanded by police to

leave the premises but continually refused; thus, under the circumstances, the court found:

> Viewed in the light most favorable to plaintiff, the evidence establishes that 1) police lifted plaintiff from his chair holding him under the arms, 2) plaintiff went limp and dropped or was dropped to the floor, 3) police began to drag him across the floor still holding him under the arms, and 4) when plaintiff indicated that he was hurt, police stopped, called an ambulance and waited for medics to arrive. This merely describes standard police procedures for arresting individuals who are passively resistant. No reasonable jury could find for plaintiff on these facts.

*Douris v. Dougherty*, No. CIV.A. 01-5757, 2003 WL 231258, at *7 (E.D. Pa. Jan. 31, 2003), aff'd, 90 F. App'x 434 (3d Cir. 2004) (emphasis added).[5] In this case, by contrast, Fiddemon's testimony raises a genuine dispute as to whether Officer Maholik or Officer Wozniak told Fiddemon to walk to the holding cell or warned him that they would take him there forcibly before they ultimately did so.

---

[5] *See also Green v. Missouri*, 734 F.Supp.2d 814, 839 (E.D. Mo. 2010), *aff'd sub nom. Green v. Nocciero*, 676 F.3d 748 (8th Cir. 2012) (plaintiff could not maintain an excessive force claim when he was dragged by officers approximately 30 to 50 feet because "[i]t [wa]s undisputed that [Defendant] refused to walk out and instead went limp so that the officers would be forced to use their own strength to remove [him]."); *Freeman v. Gay*, No. 3:11-0867, 2016 WL 6432796, at *7 (M.D. Tenn. Oct. 31, 2016), *report and recommendation adopted*, No. 3:11-CV-00867, 2016 WL 7035141 (M.D. Tenn. Dec. 2, 2016) (plaintiff could not maintain an excessive force claim when "it [wa]s undisputed that Plaintiff himself caused his legs to go limp and refused to walk while he was being escorted, thus, requiring the officers to forcibly drag him.").

Moreover, some courts have found that certain pain compliance techniques are not objectively unreasonable in the context of a plaintiff who is passively resisting arrest over a prolonged period of time, and force was used after the issuance of warnings. *See, e.g., Wade v. Colaner*, No. CIV.A. 06-3715-FLW, 2010 WL 5479629, at *10 (D.N.J. Dec. 28, 2010) (citing *Meecham v. Frazier*, 500 F.3d 1200, 1204–05 (10th Cir. 2007) (no excessive force when, during a traffic stop that turned into a "fifty-minute ordeal requiring arrest" because the plaintiff refused to answer questions, stop talking on her cell phone, or get out of her car, and after repeated warnings, officers used pepper spray to bring the woman out of the car and onto the ground); *Crowell v. Kirkpatric*k, 667 F.Supp.2d. 391, 410 (D. Vt. 2009) (no excessive force where officers, forty minutes after arriving to a property and spending time trying to use less intrusive means of arrest, tased protestors)). By contrast, in this case, Fiddemon's testimony raises a genuine dispute as to whether Fiddemon was resisting the officers' commands to walk to the holding cell, or whether such commands were made at all. Assuming pain compliance techniques are justified under certain circumstances, they are plainly unjustified absent any resistance to an officer's commands.

Having determined that a reasonable jury could find a constitutional violation by Officer Wozniak and Officer Maholik on the alleged facts, we next

consider whether Fiddemon's rights in this specific context were "clearly established." "When considering whether a right was clearly established, our focus is on whether the officer had fair notice that her conduct was unlawful, so reasonableness is judged against the backdrop of the law at the time of the conduct." *El*, 975 F.3d at 334 (internal quotation marks and citations omitted). "Although there need not be a case directly on point for a right to be clearly established, existing precedent must have placed the . . . constitutional question beyond debate." *Id.*

The court must define the right with specificity, *id.* at 338, and avoid speaking at "a high level of generality" when doing so, *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011.). Accordingly, in light of the material facts detailed previously, the question here is whether it was clearly established that Fiddemon had a right to be free from being put in a chokehold—or, in Officer Wozniak's case, to be free from being yanked off his chair—and dragged by multiple officers to a holding cell when (1) he was in custody at the police station for nonviolent offenses, (2) he was not commanded to walk to the holding cell, and (3) he was not resisting arrest. The court finds the right was clearly established to preclude application of the qualified immunity doctrine to Officer Wozniak and Officer Maholik.

The court need not cite reams of cases to demonstrate this right was clearly established. In *El*, the Third Circuit held it was clearly established that "an unarmed individual who is not suspected of a serious crime—including one who is verbally uncooperative or passively resists the police—has the right not to be subjected to physical force such as being grabbed, dragged, or taken down." *El*, 975 F.3d at 340. As explained *ad nauseum*, the right is even more clearly established in this case where Fiddemon allegedly did not passively resist any purported orders from the officers to walk to the holding cell. Thus, the court cannot find the officers are entitled to qualified immunity.

Therefore, Fiddemon has raised genuine disputes of material fact as to his excessive force claims against Officer Wozniak and Officer Maholik precluding summary judgment.[6]

---

[6] The court will also deny summary judgment for the officer defendants on Fiddemon's claim for punitive damages for the excessive force claims since Fiddemon has produced evidence supporting an underlying constitutional violation, which—in light of the officers' allegedly unjustified use of significant physical force and verbal antagonism toward Fiddemon—a reasonable jury could find was motivated by evil motive or intent, or reckless or callous indifference to Fiddemon's rights. *See Smith v. Wade*, 461 U.S. 30, 56 (1983).

### 2. False Arrest

"To state a claim for false arrest under the Fourth Amendment, a plaintiff must establish: (1) that there was an arrest; and (2) that the arrest was made without probable cause." *Williams*, 967 F.3d at 263 (citing *James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012)). "[P]robable cause exists if there is a fair probability that the person committed the crime at issue." *Id.* (quoting *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 467 (3d Cir. 2016) (citations, internal quotation marks, and alterations omitted)). "While probable cause to arrest requires more than mere suspicion, the law recognizes that probable cause determinations have to be made on the spot under pressure and do not require the fine resolution of conflicting evidence." *Id.* (quoting *Paff v. Kaltenbach*, 204 F.3d 425, 436 (3d Cir. 2000)).

Fiddemon has apparently abandoned his false arrest claim by not responding to Defendants' motion for summary judgment on that claim. Fiddemon's abandonment of this claim is for good reason since Defendants' have produced sufficient evidence showing that the officers had probable cause to arrest Fiddemon based on his apparent traffic violations—even if those charges were later dropped for a reason not provided to this court. Thus, the court will grant Defendants' motion for summary judgment as to Fiddemon's false arrest claim.

## B. Wilkes-Barre Township

Next, Defendants' move for summary judgment on Fiddemon's *Monell* claims against Wilkes-Barre Township, which allege: (1) a policy, custom, or practice causing a constitutional violation; (2) failure to train; and (3) failure to supervise. Each of these claims require an underlying constitutional violation. *See Mulholland v. Gov't Cty. of Berks*, 706 F.3d 227, 238 n.15 (3d Cir. 2013) (noting "[i]t is well-settled that, if there is no violation in the first place, there can be no derivative municipal claim" based on *Monell*). As explained above, Fiddemon had alleged enough facts to enable a reasonable jury to find Officer Maholik and Officer Wozniak used excessive force on him. However, even if there were a constitutional violation, the court finds Fiddemon's claims against Wilkes-Barre fail for reasons that follow.

### 1. Policy or Custom

To find a municipality liable under §1983, Fiddemon must prove the existence of a policy or custom that resulted in a constitutional violation. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694–95 (1978). Liability "must be founded upon evidence that the government unit itself supported a violation of constitutional rights." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990). A plaintiff can show the existence of a policy when a decisionmaker with final authority "issues an official proclamation,

policy, or edict." *Id.* Custom may be established by showing that a "course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id.* A plaintiff must also "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).

Defendants move for summary judgment of this claim, arguing Fiddemon has failed to produce evidence of a policy, custom, or practice of Wilkes-Barre that resulted in a constitutional violation. The court agrees. Fiddemon apparently abandons his *Monell* claim based on custom or policy since his brief in opposition contains arguments going only to his failure to train and failure to supervise claims. Thus, the court finds Fiddemon has failed to produce evidence of a custom or policy of Wilkes-Barre that led to a constitutional violation; summary judgment of this claim will be granted.

### 2. Failure to Train

Notwithstanding a failure to identify an unconstitutional policy or custom, a §1983 claim against a municipality may proceed if the plaintiff can establish that his injury "w[as] caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (quotation marks and citations omitted).

"Plaintiffs establishing municipal liability under this second 'failure or inadequacy' route—which does not require showing an actual unconstitutional policy—must demonstrate that the 'failure or inadequacy' rose to the level of 'deliberate indifference on the part of the municipality.'" *Richardson v. City of Newark*, 820 F. App'x 98, 105 (3d Cir. 2020) (quoting *Forrest*, 930 F.3d at 106). To meet the deliberate indifference standard in a failure-to-train claim, "the identified deficiency in a city's training program must be closely related to the ultimate injury." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989).

Defendants argue they are entitled to summary judgment on this claim because Wilkes-Barre provides use of force training to its officers and Fiddemon failed to present evidence that the officers needed more training in any particular area. Fiddemon counters, "[T]he facts clearly show the Township has failed to train its police officers in the Use of Force and De-escalation techniques." (Doc. 30). In support, Fiddemon cites the depositions of the officer-defendants, in which, according to Fiddemon, they "ultimately admitted they have received no Use of Force training prior to the incident." (Doc. 30-1).

The court finds that Fiddemon has failed to produce sufficient evidence as a matter of law to survive summary judgment of his failure to train claim.

First, Fiddemon has not provided evidence of a particular hole or shortcoming in Wilkes-Barre's training of its officers. As explained above, Defendants produced evidence that Wilkes-Barre officers receive required training which includes use of force.[7] Fiddemon, in reply, makes much of the officers' inability to recall details regarding their use of force training. For example, Officer Wozniak testified he has received use of force training in the academy but went onto describe his training as involving "just your basic grappling type maneuvers. Years later, I received training from the Pennsylvania State Police with vehicle removal techniques and that's the gist of it." (Doc. 30-1 at 10–11). Officer Maholik testified he received use of force training almost annually, but he said he could not explain what the training entailed.[8] Officer Kaskey described yearly trainings regarding use of force

---

[7] For example, Officer Clark, Chief of Police in Wilkes-Barre, testified that use of force training was provided through the Municipal Police Officers Education and Training Commission and field training programs prior to the incident. (Doc. 24-7 at 20-22, 32). He testified that in 2018 there was mandatory in-service training through MPOETC, the commission which previously determined when use of force training was required for officers. (Doc. 24-7 at 23, 27). Officer Maholik testified he received use of force training almost annually. (Doc. 24-2 at 44, 46).

[8] While Fiddemon makes much of Officer Maholik's initial statement that he could not explain the training, Fiddemon omits Officer Maholik's follow-up answer in which he explained, "Generally, use of force training is a review, goes over the use of force continuum and just a review or reminder of, you know, an officer's ability to use force in a situation to gain compliance of an individual and neutralize a threat." (Doc. 24-2 at 45–46).

as "a refresher of our policy, the refreshing on the handling of equipment," and "[a]s it relates to arrest and control techniques . . . I believe it may have been touched upon briefly in [a 2012 training]." (Doc. 30-1 at 12). Officer Troutman testified he had not had training on use of force while employed by Wilkes-Barre Township Police Department for approximately two years. (Doc. 30-1 at 13). That some officers could not recall the exact nature of their training does not raise a genuine dispute on this issue. Moreover, even if it is true that Officer Troutman did not receive use of force training, "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Harris*, 489 U.S. at 390–91. Thus, Fiddemon's evidence does not raise a genuine dispute as to whether Wilkes-Barre trained its officers in use of force, let alone display deliberate indifference on the part of Wilkes-Barre.

Next, Fiddemon has failed to establish the requisite causal connection between Wilkes-Barre's purported failure to train and the officers' actions in this case. See *Harris*, 489 U.S. at 391 ("the identified deficiency in a city's training program must be closely related to the ultimate injury"). Even assuming Fiddemon had pointed to supposed holes in Wilkes-Barre's officer training in use of force, he makes no attempt to connect the lack of training

to the officers' conduct in this case apart from conclusory allegations that the lack of training "demonstrates 'deliberate indifference' to the obvious consequences of the failure to train," and "[t]he high degree of predictability supports an inference of causation—that the Township's indifference led directly to the very consequence that was so predictable in this case." Fiddemon's argument amounts to an assertion that (1) Wilkes-Barre does not provide adequate training on use of force and (2) the officers here used improper force. This does not constitute evidence from which a reasonable jury could infer the purported deficiency in training was closely related to the officers' conduct. *See id.* (alleged deficiency in training must be closely related to the alleged unconstitutional conduct because "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, [said] plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident").

Finally, the Third Circuit counsels that in order for a municipality to be held liable based on a single incident of a constitutional violation, a Plaintiff must show either: (1) the existence of a "pattern of violations [that] puts municipal decisionmakers on notice that a new program is necessary" or (2) that "the need for training [is] so obvious that failure to do so could properly be characterized as deliberate indifference to constitutional rights even

without a pattern of constitutional violations." *Thomas v. Cumberland County*, 749 F.3d 217, 223 (3d Cir. 2014) (citing *Harris*, 489 U.S. at 390 n.10) (internal quotation marks omitted). Fiddemon offers no evidence of a pattern of violations that would have put Wilkes-Barre decisionmakers on notice nor that the need for training is so obvious that a failure to do so could properly be characterized as deliberate indifference. Thus, the court finds that, on this record, Fiddemon has failed to establish a claim against Wilkes-Barre for failure to train.

### 3. Failure to Supervise

"[F]ailure to train, discipline or control can only form the basis for section 1983 municipal liability if the plaintiff can show both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and (2) circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate." *Moore v. Solanco Sch. Dist.*, 471 F. Supp. 3d 640, 669 (E.D. Pa. 2020) (quoting *Montgomery v. De Simone*, 159 F.3d 120, 127 (3d Cir. 1998)).

Defendants argue Fiddemon has not presented any evidence to establish the above-listed elements. Fiddemon argues in response:

> [Wilkes-Barre] is not entitled to summary judgment on Plaintiff's failure to supervise claim. Defendants failed to have policies and

procedures in place to document and surveil the use of force at their police station. The police department should have had video cameras in the processing room and holding cells, and a process by which the video footage would be saved in the event force was used on a prisoner to ensure officers did not abuse their authority, such as in this case. Had Defendants been under proper supervision, they would not have brutalized Plaintiff at their police station. By failing to supervise its police officers, Wilkes-Barre Township knew or acquiesced in a custom of tolerating the tacit use of excessive force by police officers. As such, Plaintiff's failure to train and supervise claims must not be dismissed.

(Doc. 30 at 5). As can be seen, Fiddemon does not point to either (1) "contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents" or (2) "circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate." *Montgomery*, 159 F.3d at 127. Moreover, Fiddemon does not direct the court to—nor is the court aware of—case law indicating that failing to place video cameras in the processing room and holding cells, without more, could support a failure to supervise claim under *Monell*. Finally, Fiddemon does not point to any evidence in the record on which a reasonable jury could find that an alleged lack of cameras at the police station, and Wilkes-Barre's alleged knowledge thereof, was the "moving force [behind the officers' purported] constitutional violation," *see Harris*, 489 U.S. at 389, or that a supervisor was "directly and actively involved in the subordinate's unconstitutional conduct," *see Brown*

*v. Grabowski*, 922 F.2d 1097, 1119–20 (3d Cir. 1990). Accordingly, the court will grant Defendants' motion for summary judgment with respect to Fiddemon's failure to supervise claim.

## IV.    CONCLUSION

In light of the foregoing, the court will **GRANT in part and DENY in part** the defendants' motion for summary judgment. The court will **DENY** summary judgment of Fiddemon's excessive force and punitive damages claims against Officer Wozniak and Officer Maholik, and **GRANT** summary judgment for the defendants on Fiddemon's remaining claims. An appropriate order follows.

*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: March 31, 2023**
21-144-02